UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN PALMER,

Plaintiff, Case No. 2:17-cv-10309

v.

HON. AVERN COHN

CSC COVANSYS CORPORATION, and
COMPUTER SCIENCES CORPORATION,
Defendants.

_________________________________/

**ORDER AND MEMORANDUM DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 21, 47)**

## I. INTRODUCTION

This is an age and national origin discrimination case under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) –2(a)(1) ("Title VII"), and the Michigan Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* ("ELCRA"). Plaintiff, John Palmer, is suing his former employers, CSC Covansys Corporation and Computer Sciences Corporation, claiming that he was wrongfully terminated because of his age and national origin. Palmer's complaint is in four counts:

- Count I: Employment Discrimination in Violation of the ADEA
- Count II: Age Discrimination in Violation of the ELCRA
- Count III: National Origin Discrimination in Violation of Title VII
- Count IV: National Origin/Ethnic Discrimination in Violation of the ELCRA

(Doc. 1). Palmer asks for compensatory damages, punitive damages, equitable and injunctive relief, and attorney's fees, costs, and interest.

Now before the Court is Defendants' Motion for Summary Judgment (Doc. 21, 47). For the reasons that follow, the motion is DENIED.

## II. BACKGROUND

### *A. Procedural History*

Plaintiff, John Palmer ("Palmer"), filed a complaint against his employer, CSC Covansys Corporation and Computer Sciences Corporation ("CSC"), saying he was unjustly terminated because of his age (60) and ethnicity/national origin (Caucasian/US) (Doc. 1). Defendants, CSC, respond by saying that Palmer's termination was motivated by a reduction-in-force program and not because of his age or national origin (Doc. 9).

At the close of discovery, CSC filed a motion for summary judgment (Doc. 21), and Palmer filed a response (Doc. 26, 27). On February 22, 2018, the parties held a phone conference in which Palmer said there were still outstanding discovery issues. Palmer's motion on the outstanding discovery issues related to information about the employee(s) that ultimately replaced him at CSC. After hearing oral arguments on Palmer's motion, the Court decided not to grant his motion to compel. Instead, the Court ordered the parties to supplement their briefs to reflect whether Palmer is entitled to an adverse inference regarding the allegedly unanswered discovery requests. (Doc. 45). The Court took the motions under advisement.

### *B. Plaintiff's Employment at CSC*

Palmer began working for CSC in 1997 as a Professional Programmer Analyst.[1] CSC is a provider of IT services to government and private industry clients. CSC assigned Palmer to provide IT services to one of CSC's clients, Fiat Chrysler Automotive ("FCA").

The "FCA account" was divided into two sub-portfolios, "Powertrain" and "Assembling and Stamping." These sub-portfolios were supervised by Ajay Gedela and Rajesh Singh, both of whom reported to manager Sudhir Baddam. The FCA account also had an administrative manager, Rajeshwar Lingampally. These supervisors/managers never reported that Palmer's work on the FCA account was unsatisfactory.

In 2015, Palmer received his certification in Project Management. After his certification, Palmer asked his supervisors/managers to look for a Project Management position for him within CSC. Anticipating his departure to a Project Management position, Palmer was asked to train two individuals on the applications he supported within the FCA "Powertrain" sub-portfolio. After he completed training the two individuals, Palmer was transferred to the "Assembly and Stamping" sub-portfolio. There was no Project Management positions available at the time of his transfer. Shortly after his transfer, Palmer was notified that "CSC made a business decision to reduce headcount in your group, consistent with Human Resource Management Policy 213, Reduction in Force (RIF). As a result, we regret to inform you that your position

---

[1] The parties dispute whether the job title was "Senior Programmer Analyst" or "Professional Programmer Analyst." However, Palmer's actual seniority is not in dispute.

will be impacted by this decision, and your employment will be terminated effective February 5, 2016." (Doc. 27-21, Ex. 28, pg. 15).

### *C. Defendant's "Reduction-in-Force" Program*

CSC periodically evaluates its workforce to determine where profit margins can be increased through a reduction of labor costs. CSC refers to this internal evaluation as a "Get Fit" or "cost take-out" program. This program is essentially the reduction-in-force ("RIF") referenced in Palmer's termination letter.

According to Defendants "Get Fit" program, labor costs can be minimized by replacing higher-salaried, more-experienced employees with lower-salaried, less-experienced employees. This experienced-based employee swap is referred to as "pyramiding." It was pursuant to this policy that Palmer was terminated.

In addition to the "Get Fit" program calling for a *replacement* of more-experienced, higher-salaried employees, FCA required CSC to maintain on-site staffing levels. This contractual obligation makes a reduction of on-site employees a non-option for CSC.

In conjunction with Defendants' "Get Fit" program, Defendants circulated an internal company memorandum (Doc. 27-7, Ex. 14).[2] In pertinent part, the memo states:

> Work Force Optimization initiatives have included:
>
> ...
>
> 2. Pyramid
>    - Replacing Level 4/5 resources with Level 3 resources – leading to increases in OI and a more healthy pyramid

[2] Palmer states the memorandum was drafted and circulated in 2015, which has not been disputed by Defendants.

structure. Assumption is Level 4/5 salaries are more expensive than level 3.

- Reshaping overall Pyramid at account level/CoE level (regardless of OI improvements)

3. Work Migration
   - Positions on site . . . **moved to offshore/nearshore with no revenue impact**
4. Subcontractor
   - **Replacing a SubK – with H1B candidate from India**

. . .

#1. A Healthy Pyramid:

We have performed a study that shows a truly competitive mix of experience levels in your industry is as follows:

Levels 0-3 (0-2 Years of experience): 30%
Level 4 (2-4): 57%
Level 5 (4-6): 12%
Level 6+ (7-9+): 1%

. . .

Other Background Information (for CSC Employees Only)

As our clients consider the value of a pyramid reshaping exercise, they need to **appreciate the value of building out the "base" with younger, less experienced people (e.g. Millennials)** because:

- Millennials have surpassed Gen Xers as the largest generation in US labor force.
- By year 2020, millennials will make up 50% of the employee population.
- In order to harness 2X your current productivity, companies need to act NOW to shift to a healthy combination of "experience" levels.

(Doc. 27-7, Ex. 14) (emphasis added). Palmer says this document proves that his termination and replacement by a younger, Indian employee at CSC was motivated by improper, discriminatory factors.

### *D. Plaintiff's Termination*

Palmer says that there are several instances on the record that show his termination was based on age and national origin discrimination: (1) Defendants

deviated from company policy in regards to finding other employment for Palmer within the company, (2) Defendants treated younger, Indian employees more favorably, and (3) Defendants have a pattern and practice of discrimination.

*1. Defendants' Deviation from Company Policy*

Palmer says that Defendants deviated from company policy because they did not find him other employment within CSC. According to Palmer's termination letter, he was terminated pursuant to "Human Resource Management Policy 213, Reduction in Force (RIF)" (Doc. 27-21, Ex. 28, pg. 15). Under this policy, "when two people, in CSC's judgment, possess equal knowledge, skills and ability, reliability, and substantially similar conduct and performance records, the person with the least length of service shall be selected first for involuntary termination." (Doc. 26-9, Ex. 29, pg. 1-2). Additionally, "[i]nternal sourcing resources will be used to identify placement opportunities within the company prior to a reduction in force. Employees have the responsibility to engage with the internal sourcing resources and actively participate in pursuing opportunities of interest." Id.

First, Palmer says that CSC deviated from company policy when he was terminated over persons of similar knowledge and performance record with less length of service. Palmer generally references 21 individuals on the FCA account with less seniority, but fails to show how these individuals had similar knowledge and experience.

Second, Palmer says that CSC deviated from company policy when it failed to consider him for internal placement. Under the CSC policy, it is the *employee's* "responsibility to engage with the internal sourcing resources and actively participate in pursuing opportunities of interest." However, Palmer proffered an email between his

supervisors/mangers that shows he was singled-out and purposely excluded from the benefits of CSC's internal placement policy. In the email, John Palmer (and Carlo Toppi, another 60 year-old Caucasian-American) are identified by supervisors/mangers as being qualified for opportunities within CSC, but then states that "there is an expectation from the senior execs that the resources identified have to be let go from CSC and not used on any future opportunities." (Doc. 27-17, Ex. 24).

In addition to a deviation from formal company policies, Palmer says that CSC breached an implicit policy/practice when it replaced him with a "subcontractor"[3] (Doc. 27-11, Ex. 18). In an email between Palmer's supervisors/managers, there is mention that CSC "cannot RIF these candidates and backfill them with contractors." (Id.). This is significant because a jury can conclude that this statement was an informal company policy, and the parties do not dispute that Palmer was in fact replaced by a subcontractor.

*2. Defendants' Favorable Treatment of Younger, Indian Employees*

Palmer says that Defendants treated younger, Indian employees favorably. In support of this assertion, Palmer primarily points to Mohan Rao Pallapothu ("Mohan") and Lalith Myneni ("Lalith").

Comparatively, Mohan and Palmer held the same job title of "Professional Programmer Analyst." (Doc. 27-12, Ex. 19, pg. 2). Mohan had less experience at CSC, was younger than Palmer, was known by CSC to be of Indian national origin, and had

---

[3] CSC continuously places undue emphasis the distinction between a subcontractor and an employee. There is nothing on the record that shows any difference regarding the employee/subcontractor's responsibilities within the company based upon CSC's distinction of "subcontractor" or "employee."

an annual salary that was slightly higher than Palmer's. Similar to Palmer, Mohan was initially identified as a candidate for CSC's "Get Fit" program and was to be released from the FCA account (Doc. 27-18, Ex. 25). However, Mohan was subsequently taken off the RIF list and given other employment within CSC (Doc. 26-3, Ex. 2, pg. 17-18).

Additionally, Lalith was also a "Professional Programmer Analyst" within CSC. Lalith was younger than Palmer, had less experience within CSC, and had an annual salary that exceeded Palmer's by more than $5,000 (Doc. 27-15, Ex. 22, pg. 2). Nevertheless, Laith was retained by CSC and not selected for termination.

*3. Defendants' Pattern and Practice of Discrimination*

Lastly, Palmer says that his discrimination claims can be further evidenced by CSC's pattern and practice of discrimination. To support this assertion, Palmer says that the internal company memo (Doc. 27-7, Ex. 14 (quoted *supra* pg. 5)) evidences a discriminatory practice of favoring younger, Indian employees. In addition to the internal company memo, the record reflects that of the 34 individuals terminated from recent "Get Fit" action, 25 individuals were over the age of 40, 18 individuals were over the age of 50, and 8 individuals were over the age of 60 (Doc. 42, Ex. 3). The average age of recent RIF terminations is 48 years-old. Additionally, with respect to Palmer's specific job title—Professional Programmer Analyst—only one employee recently terminated was under the age of 50, and the average age of termination was 55 years-old. Palmer says that this shows that CSC's "Get Fit" program (RIF) is not only explicitly discriminatory, but also shows a pattern and practice of company-wide discrimination.

### *E. Plaintiff's Replacement*

It is undisputed that the FCA account did not permit a reduction of on-site staffing levels. Thus, CSC had to replace Palmer on the FCA account. It is not clear from the record, and disputed between the parties, who "replaced" Palmer.

Originally, CSC hired a subcontractor, Aditya Thummala ("Thummala"), to assume Palmer's duties and responsibilities. (Doc. 21-9, Ex. E, 48:21-49:3). Thummala had Java/J2EE experience, which Defendants say was a factor in deciding to terminate Palmer. Thummala was younger than Palmer, and although Palmer does not submit direct evidence proving Thummala's national origin, he does submit evidence of Thummala having ties to India (*e.g.* Thummala went to school in India and worked for Macy's "offshore India").

Defendants say that even though Palmer was supposed to be replaced by Thummala, Palmer's "ultimate replacement" was Venkata Gadey ("Gadey") because Thummala quit just two weeks after being hired (Doc. 37, pg. 18, ¶29). Similar to Thummala, Gadey was younger than Palmer,[4] and had Java/J2EE experience. Although Palmer requested that Defendants provide the national origin of Thummala and Gadey, Defendants did not collect such information because they were classified within CSC as "subcontractors," not employees. Excluding the request for Defendants to produce this information, Palmer did not make any additional effort to collect national origin information for Thummala or Gadey. Consequently, Palmer has failed to establish the national origin of Gadey, and has no direct evidence regarding the national origin of Thummala.

---

[4] Peculiarly, Defendants' employee records for both Thummala and Gadey list the same date of birth: 01/01/1970 (Doc. 34-1, Ex. 11).

Notably, the CSC employee record for Gadey states that his employment "Term. Date" was 09/09/2016 (Doc. 34-1, Ex. 11). Palmer's interrogatories to Defendants requested the identity, national origin information, age and other personal information regarding "each person and/or persons who were employed or hired by Defendants to replace, assume, and/or perform all or some of the duties previously performed by Plaintiff **between his last day of work and the present time**" (emphasis added). Defendants have not provided Palmer with the employment information regarding Gadey's replacement because Defendants claim that this information is irrelevant. However, if Defendants are correct in their assertion that the "replacement of a replacement" is irrelevant, any company could avoid liability for improper terminations by disconnecting the employee's replacement with a subcontractor within the protected class. Additionally, in one instance, Defendants' respond to a discovery request regarding this information and state that they are not able to produce any replacement information. This seems very unlikely given the fact that the FCA account requires a fixed number of on-site employees. Thus, the Court finds it can consider Gadey's replacement is relevant as an indirect replacement of Palmer, and this information should have been provided.

Moreover, the record reveals another employee that could be considered as Palmer's replacement. When Palmer made it clear that he desired a Project Management position, a "knowledge transfer" began between him and Sudhakar Munjuluri ("Sudhakar") to replace him on the "Powertrain" sub-portfolio.[5] This

[5] There was also an employee that was trained as a "backup" to Sudhakar identified as Gabe Bushar. However, neither party submits evidence to prove age or national origin of this employee (Doc. 26, Ex. 11, pg. 8).

"knowledge transfer" began in April 2015, and lasted several months. In his deposition, Sudhakar says that a CSC "knowledge transfer" is a continuous process in which the employee will slowly take over a position and troubleshoot any issues with the person that they are replacing (Doc. 26-5, Ex. 4, pg. 11). Additionally, Palmer said in his deposition that the knowledge transfer with Sudhakar was "a long transition" and "after the knowledge management, knowledge turnover, I had to work with him quite a bit still to help him out." (Doc. 26-2, Ex. 1, pg. 46). This is significant because a jury could consider Palmer's replacement on the "Powertrain" portfolio as connected to his termination soon thereafter, and this replacement (Sudhakar), was of Indian national origin.

## III. LEGAL STANDARD

### *A. Summary Judgment*

A motion for summary judgment will be granted if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986)). In doing so, the Court "must view the evidence in the light most favorable to the non-moving party." Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc., 69 F.3d 98, 101–02 (6th Cir. 1995). "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)) (emphasis added).

### *B. Age Discrimination*

Michigan's "ELCRA claims are analyzed under the same standards as federal ADEA claims." Till, 805 F.Supp.2d at 368 (citing Greiger v. Tower Automotive, 579 F.3d 614, 626 (6th Cir. 2009)). "Thus Plaintiff's claims under the ADEA and Michigan's ELCRA will be analyzed together." Id. A plaintiff can prove age discrimination by "either direct or circumstantial evidence." Greiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009). A plaintiff seeking to prove a case of employment discrimination through the use of circumstantial evidence must do so under the McDonnell Douglas framework. See Young v. United Parcel Services, Inc., 135 S.Ct. 1338, 1353 (2015); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "The framework requires a plaintiff to make out a *prima facie* case of discrimination. But it is 'not intended to be an inflexible rule.'" Id. (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575 (1978)). "The burden of making this showing is 'not onerous.'" Id. at 1354. (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)). A plaintiff is not required to show that "those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." Id. (citing McDonnell Douglas, 411 U.S. at 809)).

To establish a *prima facie* case of age discrimination, a plaintiff must show: "(1) membership in a protected group;[6] (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of

[6] The law recognized age discrimination protections for persons of at least 40 years old. Till v. Spectrum Juvenile Justice Services, 805 F.Supp.2d 354 (E.D. Mich., 2011); Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 317 (6th Cir. 2007).

discrimination." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002). "An allegation that a plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant." Blizzard, 698 F.3d at 283. The Sixth Circuit has recognized that "an age difference of ten or more years is generally considered significant." Id. (citing Grosjean v. First Energy Corp., 349 F.3d 332, 336 (6th Cir. 2003)). However, the Sixth Circuit has also stated that a claim of discrimination in relation to a reduction-in-force initiative triggers "additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Barnes v. Gen Corp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

"Once the plaintiff succeeds in making out a *prima facie* case of age discrimination, the defendant must 'articulate some legitimate, nondiscriminatory reason' for the termination." Blizzard, 698 F.3d at 283 (quoting Griger, 579 F.3d at 802). "If the defendant meets this burden, then the burden of proof shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 615 (6th Cir. 2003).

To prove pretext, Plaintiff must show that (1) the proffered reason for termination had no basis in fact, (2) the proffered reason did not actually motivate the decision to discharge, or (3) the proffered reason was insufficient to motivate a discharge. Id.; Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2012). This three-part test is not applied rigidly. Id. When evaluating pretext at the summary judgment phase, "the court should consider all evidence in the light most favorable to the plaintiff,

including the evidence presented in the *prima facie* stage." Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 812 (6th Cir. 2011).

### *C. National Origin Discrimination*

In the Sixth Circuit, claims of national origin discrimination under Title VII and ELCRA are reviewed under the same standards. Idemudia v. J.P. Morgan Chase, 434 Fed.Appx. 495, 499 (6th Cir. 2011). Thus, under both claims, a plaintiff must advance a *prima facie* case of national origin discrimination by demonstrating "(1) he is a member of a protected class;[7] (2) he was qualified for his job; (3) he suffered an adverse employment decision; (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." Id. (quoting White v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008)).

Similar to age discrimination, circumstantial evidence of race and national origin discrimination is subject to the McDonnell Douglas framework. Thus, once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for the termination." Blizzard, 698 F.3d at 283 (quoting Griger, 579 F.3d at 802). "If the defendant meets this burden, then the burden of proof shifts back to the plaintiff to demonstrate that the proffered reason is a pretext." Sutherland, 344 F.3d at 615.

A pretext analysis in the national origin context is similar to the pretext analysis in an age discrimination case. The Plaintiff must demonstrate that a jury could find

---

[7] Caucasian-American is a protected class. See, e.g. Turney v. Hyundai Const. Equip. USA Inc., 482 Fed. Appx. 259, 260 (9th Cir. 2012) (holding that Caucasian-American plaintiff belonged to a protected class for purposes of national origin discrimination); McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280 (1976) (holding that Title VII prohibits discrimination against Caucasian persons).

Defendants' proffered reasons for termination "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." Idemudia, 434 Fed.Appx. at 503. In the Sixth Circuit, "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1167 (6th Cir. 1996).

### D. Evidence of a Pattern-or-Practice

In the Sixth Circuit, "the pattern-or-practice method of proving discrimination is not available to individual plaintiffs." Bacon v. Honda of America Mfg. Inc., 370 F.3d 565, 575 (6th Cir. 2004). "[A] pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." Id. "However, pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework." Id. "[I]f a plaintiff has presented a viable claim of disparate treatment, a pattern or practice of discrimination may constitute additional, relevant evidence." Hannah v. Blue Cross Blue Shield of Michigan, 2017 WL 3642656, *6 (Aug. 24, 2017). Thus, evidence of a pattern-or-practice of discrimination can be offered to prove pretext. See DeWalt v. Meredith Corp., 484 F.Supp.2d 1188, 1197 (2007); Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 761(1998), vacated on other grounds, 527 U.S. 1031 (1999).

## IV. ANALYSIS

*Count I & II: Age Discrimination*

Here, Plaintiff has established a *prima facie* case of age discrimination. First, Plaintiff was a member of a protected group because he was over 60 at the time the

claimed discrimination occurred (Doc. 25 - ¶4). Second, although factually contested, Plaintiff was arguably qualified for the job in question (Doc. 25 - ¶14).[8] Third, Plaintiff suffered an adverse employment action when he was terminated from employment (Doc. 22 - ¶27). Lastly, the circumstances support an inference of discrimination because the persons said to have assumed all or some of Plaintiff's duties were "significantly younger." (Doc. 22 - ¶29, Doc. 25 - ¶29).[9]

Furthermore, Palmer is not subject to the heightened evidentiary standard required by an RIF action because there was not a *de facto* reduction-in-force with respect to Palmer's position on the FCA account. It is undisputed between the parties that the FCA account did not permit a reduction of on-site staffing levels. Thus, CSC had to replace Palmer on the FCA account. Because Palmer is not held to the heightened evidentiary standard required by RIF actions, and Palmer has satisfied a *prima facie* case of age discrimination, the burden shifts to Defendants to proffer a nondiscriminatory reason for termination.

Here, Defendants have successfully proffered a legitimate business reason for termination. Defendants state that the reason for Palmer's termination was the "Get Fit" program. The "Get Fit" program allowed for lower labor costs by replacing Palmer with a less experienced employee. Thus, the burden shifts back to Plaintiff to show that a reasonable jury could find that the proffered reason for termination is pretext.

Palmer has offered sufficient evidence that would permit a factfinder to decide that Defendants' proffered reasons are pretext. First, although there is a sufficient

[8] Defendants say that Java/J2EE was a new job requirement, but Plaintiff says that the on-site FCA job duties did not require Java/J2EE experience.

[9] Both Thummala and Gadey were more than ten years younger than Palmer.

factual basis that Palmer was terminated because of the "Get Fit" program (and that he lacked Java/J2EE experience), CSC's termination letter stated that Palmer was terminated solely because "CSC made a business decision to reduce headcount in [Palmer's] group, consistent with . . . Policy 213, Reduction In Force (RIF)." (Doc. 27-21, Ex. 28, pg. 15). Because Palmer's termination letter states that he was terminated due to a reduction in headcount, which was impossible at FCA, and later Defendants stated additional reasons for termination (such as lacking Java/J2EE experience), a jury could find such reasons are pretext. See Thurman, 90 F.3d at 1167 (holding that inconsistent rationales permits a finding of pretext).

Additionally, a jury could find that age was the primary factor in termination based on Palmer's pattern-or-practice evidence (*e.g.* the company memo emphasizing the importance of a young workforce). Although Defendants' internal memo is policy-or-practice evidence not specific to Palmer, the evidence can be used to establish pretext. The memo states, "our clients . . . need to appreciate the value of building out the 'base' with **younger**, less experienced people . . ." (Doc. 27-7) (emphasis added). This statement, coupled with the advanced age of persons recently terminated, could lead a jury to find that Defendants' proffered reasons were pretext. Thus, Palmer has advanced sufficient evidence under the McDonnell Douoglas framework to survive summary judgment regarding his age discrimination claims (Counts I and II).

*Count III and IV: National Origin Discrimination*

Palmer has also established a *prima facie* case of national origin discrimination. First, Plaintiff is a member of a protected class because he is Caucasian-American. Second, although factually contested, Plaintiff was qualified for the job in question (Doc.

25 - ¶14). Third, Plaintiff suffered an adverse employment decision when he was terminated from employment (Doc. 22 - ¶27). Lastly, although factually disputed, a jury could find that Plaintiff was replaced by a person outside the protected class.

Palmer's arguments primarily relate to the last element of his national origin claim because he has failed to establish the national origin of Gadey or Thummala. However, Palmer has established that he trained Sudhakar, an employee of Indian national origin, as a replacement regarding a prior position he held shortly before termination.

The Court does not need to entangle itself with the nuances of who "replaced" Palmer, as it is sufficient to show that a person outside the protected class was treated more favorably. For example, in Rocco v. American Longwall Corp., 965 F.Supp. 709, 715, the court faced a similar situation in which the plaintiff claimed age and national origin discrimination alleging that British employees performing similar duties were treated more favorably. One of the plaintiff's claims was that British employees were "being provided with an opportunity to transfer to other locations within the [company's] conglomerate rather than being laid off." Id. at 711. One of the issues in the case was whether this opportunity was being afforded to "similarly situated" employees. Id. at 715. The court stated that the question of whether the plaintiff was a similarly situated employee was a question of fact for the jury to decide.

Similar to Rocco, it is evident in this case that persons of Indian national origin that held the same job title and were paid similar salaries, such as Mohan Rao Pallapothu, were being provided with opportunities to transfer within the company.[10] In

[10] Mohan and Palmer held the same job title of "Professional Programmer Analyst." (Doc. 27-12, Ex. 19, pg. 2). Mohan had less experience at CSC, was younger than Palmer, was known by CSC to be of Indian national origin. Similar to Palmer, Mohan

contrast, Palmer was singled out by "senior execs" and identified as a resource that had "to be let go from CSC and not used on any future opportunities." (Doc. 27-17, Ex. 24). This evidence of favorable treatment is enough to establish a *prima facie* case of national origin discrimination. Thus, the burden shifts to the Defendants to proffered a legitimate business reason for termination.

Defendants' reasons for termination are consistent with the reasoning given above in regards to the age discrimination claim: Plaintiff was terminated as the result of a "Get Fit" program (RIF action), which was implemented to reduce labor costs. This reasoning is sufficient to shift the burden back to Plaintiff to establish pretext.

Here, Palmer has submitted enough evidence to create a genuine issue regarding whether Defendants discriminated based upon national origin. Returning to Rocco, the plaintiff in that case submitted evidence that: (1) shortly before his termination, younger and/or British employees were retained by the defendant and continued performing job functions he was previously tasked with; (2) defendants retained employees that were less experienced in the industry and within the company; (3) plaintiff had been commended on a history of satisfactory employment; and (4) statistical evidence that indicated a disproportionate number of Americans were laid off in relation to overseas workers. Rocco, 709 F.Supp. at 715. The court reviewed the "totality of the issues raised in light most favorable to the plaintiff" and found sufficient evidence to render summary judgment inappropriate." Id. at 716.

---

was initially identified as a candidate for CSC's "Get Fit" program and was to be released from the FCA account (Doc. 27-18, Ex. 25). However, Mohan was subsequently taken off the RIF list and given other employment within CSC (Doc. 26-3, Ex. 2, pg. 17-18).

Similarly, Palmer has submitted evidence that would permit a factfinder to infer discrimination based on national origin. Palmer has submitted evidence that shows: (1) shortly before termination he trained an Indian employee (Sudhakar) to assume his duties; (2) Indian employees that held the same job title and were paid more (Mohan and Lalith) were not subject to the Defendants' "Get Fit" program, whereas Caucasian-American employees (Palmer and Carlo Toppi) were discharged; (3) Palmer had a history of satisfactory work on the FCA account; and (4) circumstantial evidence, such as the internal company memorandum referencing to the attractiveness of offshore work migration "with no revenue impact," and replacing subcontractors with "candidate[s] from India," as well as, deviations from what appear to be standard policies (*e.g.* replacing him with a subcontractor,[11] who has ties to India).[12] Taken together, the Court cannot say as a matter of law that Palmer has failed to establish a case of national origin discrimination.

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is DENIED. The Court will schedule a status conference to discuss pretrial matters.

SO ORDERED.

AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: 9-25-18
Detroit, Michigan

[11] In an email between Palmer's supervisors/managers, there is mention that CSC "cannot RIF these candidates and backfill them with contractors." (Doc. 27-11, Ex. 18).
[12] Aditya Thummala went to school in India and worked for Macy's "offshore India."